Jennifer Sherwood ZIEHL, a minor, suing by and through Sylvia Rhodes Ziehl, her mother and next friend

v.

MAINE NATIONAL BANK et al.

Supreme Judicial Court of Maine.

March 30, 1978.

Pierce, Atwood, Scribner, Allen, Smith & Lancaster by William C. Smith (orally), Everett P. Ingalls, III, Ralph I. Lancaster, Jr., Portland, for plaintiff.

Verrill & Dana by John A. Mitchell (orally), P. Benjamin Zuckerman, Portland, for Mary Rhodes Jackson.

Wilson, Steinfeld, Murrell, Barton & Lane by Thomas P. Wilson, Portland, guardian ad litem.

Perkins, Thompson, Hinckley & Keddy by Thomas Schulten, Portland, for Maine Nat. Bank and Woodfords Congregational Church.

Before DUFRESNE, C. J. and WERNICK, ARCHIBALD, GODFREY and DELAHANTY, JJ.

WERNICK, Justice.

On November 19, 1973 plaintiff Jennifer Sherwood Ziehl, a minor and lawfully adopted child of Sylvia Rhodes Ziehl, by her mother as her next friend, instituted a civil action in the Superior Court (Cumberland County) seeking a declaratory judgment interpreting the wills of Carrie S. Rhodes and Richard A. Rhodes.[1]

Carrie S. Rhodes died on May 9, 1968. Her husband Richard A. Rhodes died on March 2, 1970. Their wills were subsequently proved and allowed in the Probate Court of Cumberland County.

Carrie's will, executed under date of December 13, 1962, established a residuary testamentary trust involving both real and personal property. Her husband Richard was to have the benefit of the annual income of the trust during his lifetime, and at his death the trust corpus was to be divided in two equal parts, the income from each part to be used, respectively, for the benefit of Carrie's daughter Sylvia Rhodes Ziehl and Carrie's stepdaughter Mary R. Jackson. At Sylvia's death, Sylvia's share of the trust was to be distributed free of trust

> "to the then living *children* of my daughter Sylvia in equal shares", (emphasis supplied)

and to other named beneficiaries should no "children" of Sylvia be "then living."

The will of Richard A. Rhodes, executed under date of February 13, 1961, established a residuary testamentary trust similar to the one created by Carrie's will. Because Carrie predeceased Richard, the corpus of Richard's trust became divided in two equal parts, the annual income of each part to be used, respectively, for the benefit of Richard's daughters Mary Rhodes Jackson and Sylvia Rhodes Ziehl. At Sylvia's death, her share of the trust was to be distributed free of trust in equal shares to Sylvia's "then living *children*" (emphasis

supplied) and to other designated beneficiaries should there be no "children" of Sylvia "then living."

Plaintiff sought answer to the question whether the provision in each will for the "children" of Sylvia Rhodes Ziehl included the plaintiff, Sylvia's "child" by lawful adoption, among the beneficiaries. The Justice presiding in the Superior Court ruled that it was the intendment of each will by the designation "children" of Sylvia Rhodes Ziehl to include plaintiff as a beneficiary. Defendants[2] have appealed from the judgment so declaring.

1.

The presiding Justice recognized that there was a threshold question whether the present action should be permitted to lie. A decision now while plaintiff's mother is still living would establish, if favorable to plaintiff, only that plaintiff has an estate contingent upon her surviving her mother, and this might not happen. Acknowledging that this feature of the case, which we call the "future contingency factor", has resulted "on occasion" in decisions deferring the adjudication of issues of will construction "until the anticipated contingency occurs or is imminent", the presiding Justice also observed that the "case law in Maine on the question is inconsistent and conflicting." The Justice decided to give the adjudication here sought because he believed, as did this Court in *Gannett v. Old Colony Trust Co., Trustees,* 155 Me. 248, 153 A.2d 122 (1959), that to defer adjudication might cause the loss of highly material evidence.

We agree with the presiding Justice. Since we believe, too, that language and results of prior cases dealing with the presence of the future contingency factor seem to justify the Justice's observation that the case law appears inconsistent, we think that

---

1. Defendants in the action are (1) Maine National Bank, Trustee under trusts established by the wills of Richard and Carrie Rhodes, (2) various individual beneficiaries and contingent remaindermen under said wills; and (3) Thomas P. Wilson, as guardian ad litem for all persons and entities not otherwise represented,

either now in being or not yet in being, whose pecuniary interests in either of the two estates may be affected by the outcome of this case.

2. Separate notices of appeal were filed by the guardian ad litem and Mary Rhodes Jackson.

we may minimize further misunderstanding by indicating a clarification of the Maine law.

Evaluating the prior cases in which the future contingency factor has been addressed, we conclude that apparent inconsistencies in the decisions tend to disappear if, penetrating below the surface, we recognize the future contingency factor as the common hinge by which other independent principles were swung into operation as the real determinants of decision.

■ Among these principles we mention, first, one most frequently articulated in express terms by the cases. This principle, essentially negative in import, states that the presence of a future contingency factor relative to an issue of will construction does not affect the court's subject-matter jurisdiction. At minimum, this is plain from the specific provisions of 14 M.R.S.A. § 6051(10), and the cases have unequivocally so decided. *Baldwin v. Bean,* 59 Me. 481 (1871); *Richardson v. Richardson,* 80 Me. 585, 16 A. 250 (1888); *Haseltine v. Shepherd,* 99 Me. 495, 59 A. 1025 (1905); *Huston v. Dodge,* 111 Me. 246, 88 A. 888 (1913); *Gannett v. Old Colony Trust Co., Trustees,* supra; *First Portland National Bank v. Rodrique,* 157 Me. 277, 172 A.2d 107 (1961).

■ Although the presence of a future contingency factor does not per se impair subject-matter jurisdiction, it may nevertheless bring into play limitations deriving both from the constitutional conception of the nature of judicial power and policy considerations underlying judicial formulations as to "standing." These limitations are reflected in a second principle which warns the Court confronting a future contingency factor in relation to a will construction issue to refrain from giving the adjudication sought if the presence of the future contingency factor will make the Court's determination an advisory opinion rather than the decision of an actual case or controversy.

This is the principle which really underlay, and governed, the decision in most of the prior cases involving a future contingency factor. *Baldwin v. Bean,* supra;

*Burgess v. Shepherd,* 97 Me. 522, 55 A. 415 (1903), and *Haseltine v. Shepherd,* supra, are leading cases in this regard. *Baldwin* expressly made the point that the Court's avowedly existing jurisdiction of the general subject-matter of the construction of wills must be invoked by "parties *in interest.*" (emphasis supplied) (59 Me. at 482). *Burgess* squarely decided that the complainant must be a person having such an "interest" in relation to the particular subject-matter at issue that the Court, in the words of *Burgess,* would not be answering questions which are "moot" because raised by a person having an "interest" of only "speculative curiosity." (97 Me. at 525, 55 A. 415) In *Haseltine* the Court incisively discerned the thrust of the principle now under discussion. Reviewing the prior cases "which throw any light upon" the impact of the future contingency factor, the Court said:

"  .   .   .   barren of any statement of facts tending to show that any exigency existed which made the interpretation by the court to be *immediately useful to the parties,* they   .   .   .   show the *character of the interest* in the construction of a will which *a party must have in order to invoke the jurisdiction of the court.*" (emphasis supplied) (99 Me. at 503, 59 A. at 1028)

In *Burgess v. Shepherd,* supra, *Huston v. Dodge,* supra, and *Fiduciary Trust Co. v. Brown,* 152 Me. 360, 131 A.2d 191 (1957) the decision of the case rested squarely on this principle that the plaintiff must have such "interest" in the subject-matter as to which the construction of a will is sought as would make an adjudication by the Court the decision of an actual case rather than an advisory opinion. In each of these three cases the decision was that an executor or a trustee lacks the requisite "interest" to invoke the Court's subject-matter jurisdiction to construe a will or trust (or to give directions to executors or trustees as to their duties) where the questions submitted affect neither the rights of the executor or trustee in person or property nor powers or duties of the executor or trustee which are in reasonably imminent need of being exercised or discharged. See *Webb v. Dow,* 120 Me. 519, 115 A. 279 (1921).

■ A third principle, reflecting judicial recognition that the future contingency factor may appear in innumerably varying concrete forms, dictates that even though the parties complaining may have a sufficient interest in the subject-matter to avoid the advisory opinion difficulty, the question raised may involve so heavy an overlay of contingency, circumstantial uncertainty and remoteness that it is not presently amenable to judicial processes and techniques. The issue is thus not "justiciably ripe", and it is a wise exercise of judicial discretion to defer deciding it. We look upon *McCarthy v. McCarthy,* 121 Me. 398, 117 A. 313 (1922) as a case illustrative of the operation of this "ripeness" principle (even though that term was not expressly used by the Court).

■ Applying these discrete principles as the real determinants of decision in will construction cases involving a future contingency factor, we sustain the Justice's decision, here, to give the adjudication sought by plaintiff.

The Court's subject-matter jurisdiction is beyond question.

■ The plaintiff's interest in the issue submitted for adjudication is significantly more than "speculative curiosity." Plaintiff's "interest" is such as to make a decision presently rendered the decision of an actual case. Whether or not under the wills of Carrie and Richard Rhodes plaintiff is a designated beneficiary of the corpus of the residuary trust established by each will bears upon the *current state of the title* of the property held in trust. An adjudication in favor of plaintiff will show her to be the owner of a contingent remainder estate. This is a present title status notwithstanding that the actual possession or enjoyment of the estate must await a future event which might never occur. Regardless of whether plaintiff could alienate or convey such estate (see 33 M.R.S.A. § 152), an adjudication that plaintiff owns the estate would give her legitimate interest to monitor the trustee's discharge of duties to preserve the trust corpus for ultimate transmission to remaindermen upon termination of the life estates. Cf. *Mallett v. Hall,* 129 Me. 148, 150 A. 531 (1930).

As to the consideration whether the overall matrix from which the instant will construction issue arises makes it justiciably ripe, we find that the question is now more ripe for decision than it is ever likely to be. The presiding Justice emphasized that evidence now exists which could have critical bearing upon the proper determination of the question raised and to defer adjudication until it becomes known whether the plaintiff has survived her mother is likely to cause this evidence to be unavailable. As in *Gannett v. Old Colony Trust Co., Trustees,* supra, so here, a decision should be rendered now to

". . . eliminate the risk of a great injustice which might conceivably result if the court were compelled to act years hence in an evidentiary vacuum." (155 Me. at 251, 153 A.2d at 124)

Moreover, the issue raised does not involve the complication that its substantive nature may change depending upon which one of various future contingencies eventuates. Decision of the issue here raised will involve taking into account only present or past, not future, circumstances. Thus, the question presently has sharp delineation and is readily comprehended as an issue (although the answer may involve some difficulty of analysis).

### 2.

Appellants contend that the Justice's decision on the merits of the question raised must be reversed because the Justice based it on inadmissible evidence.

■ Appellants correctly point out that when a testator includes within his bounty the "children" of the testator's own child, the law of Maine assigns a "presumptive" meaning which excludes a lawfully adopted "child" of the testator's child. *Woodcock's Appeal,* 103 Me. 214, 68 A. 821 (1907). Appellants contend that the existence of this "presumption" made it reversible error for the presiding Justice, first, to admit in evidence and, second, to rest his decision on, particular circumstances extraneous to the

will which the presiding Justice described as follows:

(1) "Both testators knew before they executed their wills that their daughter Sylvia had undergone a hysterectomy and would never be able to have natural born children",

and (2) "[i]n view of this condition, Carrie S. Rhodes urged that her daughter should adopt children."

Appellants begin their argument with a statement from *New England Trust Company v. Sanger et al.*, 151 Me. 295, 301, 118 A.2d 760, 763 (1955) that:

"[t]he controlling rule in the construction of a will is that the intention of the testator *expressed in the will*, if consistent with rules of law, governs." (emphasis in original)

A corollary of this, appellants maintain, is that the words used by the testator to express his intent, must be the *sole* evidence of that intent—except that if, *but only if*, the face of the will reveals that the testator was inconsistent, or otherwise created doubt, in the manner in which he structurally interrelated the words he actually used, resort may be had to extraneous circumstances bearing upon testamentary intendment to assist in resolving such *internal* inconsistencies, doubts or ambiguities.

We disagree with appellants' position and sustain the approach of the presiding Justice.

While doubt or ambiguity arising from inconsistency in the testator's structural interrelating of words within the four corners of the will may illustrate the most patent and directly discernable kind of doubt or ambiguity in the testator's undertaking to express his intent, there are other ways in which it can develop that a testator's words may fail "plainly" to express intent.

The instant case well illustrates the point. Here, the problem arises because we are called upon to assign *meaning* to the word "children" as used to identify the *external objects* of the testator's bounty. In this regard, let us hypothesize two wills. Testator A's will provides: "I leave all of my property to my children." Testator B's will provides:

"I leave all of my property to such of my children's children who may be living at my death."

In each of these examples, there is no inconsistency, giving rise to doubt or ambiguity, in the manner in which the testators have used the word "children" in structural interrelationship with other words of their wills. But let us introduce the circumstances, external to the will because in no respect alluded to by any of the words of the will, that (1) two "children" of testator A are alive at his death both of whom are lawfully adopted; and (2) two "children" of testator B are alive at his death, one a natural "child" and the other a lawfully adopted "child"; and (3) testator B's natural "child" has one lawfully adopted "child" and testator B's lawful adopted "child" has one natural "child."

The above examples reveal that beyond the most obvious cases in which there may be inconsistencies in the manner in which the testator has established structural interrelationships among the words he has used within the four corners of his will, there is a much greater likelihood that doubt or ambiguity will arise when we leave the realm of the structural interrelationships of words as symbols and deal with their *meaning*—that is, when we undertake the process of associating the words of the testator with external objects having a prima facie relevance.

■ The law authorizes resort to circumstances extraneous to the will to assist in the resolution of such "meaning" doubt or ambiguity, at least in some of the forms in which it may arise.

One such kind of "meaning" doubt or ambiguity which the law recognizes as justifying the resort to circumstances extraneous to the will is that arising when the undertaking to relate words of a will to external objects reveals that *in general community usage* the words in question are associated with more than one category of external objects—that is, in relation to an external situation having prima facie rele-

vance the words lack a "plain meaning" in ordinary usage.[3]

Such is the situation in the case at bar. We are called upon to give the word "children" meaning through the process of associating the word with a prima facie relevant concrete context involving the relationship of one person to another arising from natural birth and from lawful adoption. Here, the law itself has perceived that the relationship created by lawful adoption is found so frequently in common experience that general community usage has come to use the word "children" to describe not only those naturally born but also those lawfully adopted. Indeed, that the law has deemed it necessary to attribute to the word "children" a "presumptive" meaning excluding, or including, "adopted" children depending on the context, see *Woodcock's Appeal*, supra, is ipso facto the law's recognition of the ambiguity of meaning found in general community usage. There would be no necessity for a "presumptive" meaning in the context of reality involving natural and lawfully adopted "children" if general community usage always *plainly* excluded, or *plainly* included, within the meaning of the word "children" the relationship which arises by virtue of lawful adoption.

■ The issue now before us is therefore properly formulated as follows. Since the law itself acknowledges that by general community usage there is ambiguity in the word "children" where the word's *meaning* is to be ascertained by relating the word to a real situation involving both natural birth and lawful adoption relationships, and the law's approach to the ambiguity in general community usage is to create a "presumption" of meaning, what is the function of such "presumption"?

Appellants maintain that *Woodcock's Appeal*, supra, decides that where by "presumptive" meaning a lawfully adopted child is excluded, the "presumption" fixes the meaning as a matter of law

> "unless other language *in the will* makes it clear that . . . [an adopted child] was intended to be included." (emphasis supplied) (103 Me. at 217, 68 A. at 822)

Appellants contend, in effect, that this single sentence in *Woodcock* establishes that a "presumptive" meaning is the mechanism used by the law to supply a "plain" meaning, thereby to bring into play the same principle applicable where a plain meaning exists in general community usage—the principle that there may be no resort to external circumstances to establish that the particular testator gave to the words he used a meaning different from the plain meaning.

We disagree with appellants' position.

**3.** This view of "meaning" doubt or ambiguity is narrower than that espoused by Wigmore. Wigmore maintains that:

> ". . . words *always* need interpretation; . . . the process of interpretation inherently and invariably means the ascertainment of the association between words and external objects; and . . . this makes inevitable a free resort to extrinsic matters for applying and enforcing the document. . . Once freed from . . . primitive formalism . . ., we can fully appreciate the modern principle that the words of a document are never anything but indices to extrinsic things, and that therefore *all the circumstances must be considered which go to make clear the sense of the words,*—that is, their associations with things." (emphasis in original) IX *Wigmore on Evidence*, (Third Ed.) at 227.

Especially as to wills, concerning which courts generally agree that the polestar of interpretation is to ascertain the intent expressed by each particular testator, Wigmore says that it is theoretically unsound to make determinative of "meaning" what general community usage assigns as a "plain" meaning of words—thereby to deny the right to take into account whatever external circumstances have bearing to show that the particular testator who used the words assigned a meaning to them different from the meaning which is "plain" according to general community usage. As Wigmore states this point:

> "The ordinary standard, or 'plain meaning,' is . . . the meaning of the people who did *not* write the document."

> "The fallacy consists in assuming that there is or ever can be *some one real* or absolute meaning. In truth, there can be only *some person's* meaning; and that person, whose meaning the law is seeking, is the writer of the document." (emphasis in original) Id. at 191, 192.

*Woodcock's Appeal* formulated no rule of *general* applicability concerning the legal significance, or effect, of a "presumptive" meaning but addressed *only the particular circumstances involved in that case.* The Court's opinion itself indicates, and our own independent examination of the original record before the Law Court confirms, that no offer of evidence of circumstances extraneous to the will had been made to seek to show that the particular testator conceived the word "children" to have a meaning which included a "child" by lawful adoption.

It would appear that no such resort to extraneous circumstances was attempted in *Woodcock's Appeal* because no prior decision in Maine had assigned a "presumptive" meaning to exclude in the particular circumstances addressed by *Woodcock's Appeal* the relationship of one person to another arising by virtue of lawful adoption.[4] *Woodcock's Appeal* decided for the first time in the law of Maine that the word "children" had a "presumptive" meaning which excluded adopted children when the testator was extending his bounty to the "children" of his own child,[5] this being the opposite of the meaning "presumptively" assigned when the testator was making his own "children" his beneficiaries. With such "presumptive" meaning established, and since the parties had proffered no evidence of circumstances extraneous to the will to indicate a contrary testamentary intendment, the only alternative open to the Court in *Woodcock's Appeal* was to conclude that *in the particular circumstances there presented* the "presumptive" meaning would be controlling

"unless other language in the will makes it clear that . . . [an adopted child] was intended to be included."

Even if, to advance the argument, we assume that *Woodcock's Appeal* purported to pronounce a rule of general applicability, the actual circumstances of the case would make such a pronouncement dictum, and we should consider it a theoretically unsound dictum. As we have already explained, that the law attributes a "presumptive" meaning is itself the law's acknowledgement that by the standard of general community usage the words in question lack plain meaning in relation to the context of external objects having prima facie relevance. Since by the standard of general community usage there is thus doubt or ambiguity in the meaning of the words used by the testator to express his intent, the rule usually governing is that there may be resort to circumstances extraneous to the will to assist in removing the doubt or ambiguity in the testator's *expression* of his meaning.

Indeed, in the very process of attributing a "presumptive" meaning, the law itself takes the first step in resorting to extraneous circumstances. As *Woodcock's Appeal* explains, the law derives the "presumption" of meaning by adverting to the fact that generally people prefer to keep their bounty within their own blood lines. This fact will usually be extrinsic to a particular will; particular testators usually do not state in their wills that such is their own actual preference. In *Woodcock's Appeal* itself the testator had not indicated an expression of such desire to confine his bounty to his own blood lines.

■ Since, in assigning a "presumptive" meaning, the law itself opens the door to bring in at least one extrinsic circumstance in the undertaking to resolve meaning

---

**4.** The party in *Woodcock* who was claiming inclusion of the relationship arising from lawful adoption apparently thought it unnecessary to advert to evidence extraneous to the will. Prior Maine law, as established by *Warren v. Prescott*, 84 Me. 483, 24 A. 948 (1892), held that in a context in which a testator wills real or personal estate to a relative who predeceases the testator leaving "lineal descendants", such that the "lineal descendants" take the estate which would have been taken by such

deceased relative had he survived, "lineal descendants" include a lawfully adopted child.

**5.** *Woodcock's Appeal* also may have been the first case in the country to formulate such a "presumptive" meaning. See Oler, Construction of Private Instruments where Adopted Children are Concerned: II, 43 Mich.L.Rev. 901, 906–917, 932–938 (1945) and appropriate cases collected in Annot. 86 A.L.R.2d 12.

doubt or ambiguity arising because there is no plain meaning according to general community usage, why should the door then be immediately closed to other relevant extrinsic circumstances? The only theoretically sound approach is to keep the door open to permit consideration of the *total import of all* objective [6] extraneous circumstances, general or particular, which can assist in clarifying the meaning the testator sought to express by words which lack a plain meaning in general community usage as applied to the context of reality involved.

In this theoretically sound process of taking into account *all* of the material external objective circumstances the "presumption" of a meaning is the mechanism the law creates to resolve the difficulty arising in the event a showing of *all* the relevant extraneous circumstances provides no basis for a fair conclusion as to the meaning attached by the particular testator to words he used which are ambiguous in general community usage. In such event the "presumptive" meaning prevails.

That the foregoing analysis is a proper evaluation of *Woodcock's Appeal* as an individual case, as well as a correct exposition of general principles of Maine law, is shown by *Wilder v. Butler*, 116 Me. 389, 102 A. 110 (1917), a case decided ten years after *Woodcock's Appeal.* Several of the Justices who decided *Woodcock's Appeal* participated in *Wilder v. Butler*, among them the author of the opinion in *Wilder v. Butler*, Chief Justice Cornish. After a careful review of the law prior to *Woodcock's Appeal,* the Chief Justice addressed the "presumptive" meaning established by *Woodcock's Appeal.* He then explained that this "presumption" of meaning becomes controlling ". . . *unless in other ways* " (emphasis supplied) it is shown that the writer of the document had a different intention as to meaning. That "other ways" is broader than "other language in the will" is made clear by the fact that Chief Justice Cornish discussed various potentially material circumstances *extraneous to the will* before he arrived at the conclusion that "[t]he case is barren of any facts suggesting . . . ." a different intention as to meaning by the writer of the document. Furthermore, and most significantly, the analysis by Chief Justice Cornish at the conclusion of the opinion reveals that he conceived the "presumptive" meaning as merely a statement of a directive which comes into play in the event *all* the relevant circumstances yield no fair conclusion as to the meaning the testator assigned to the language used by him—the directive being that in such event the party who seeks to assign a meaning different from the "presumed" meaning fails in his claim. The concluding language of the opinion in *Wilder v. Butler* is:

> "The burden is upon the defendants here to show that it was the intention of the settler to include an adopted child of William L. Wilder, when he used the words 'child or children' in his trust deed. We can find nothing to indicate that the settler had in mind any other than the child or children by blood, children in fact, in the ordinary signification of the term. The burden resting upon the defendants

---

**6.** As shown by *Bryant v. Bryant*, 129 Me. 251, 151 A. 429 (1930) the testator's own declarations of his intention, whether made before or after execution of the will, are not admissible as evidence (except in rare situations such as, for example, the situation of "equivocation" where a term as applied to external objects is found to apply *equally* to two or more of them).

While, obviously, such statements would be useful to assist in determining the meaning with which the testator used particular words, a strong policy reason requires their exclusion as evidence. The policy has especially cogent force as to wills which by law must have a prescribed objective form. The policy has been stated as follows:

> "When a transaction has been . . . voluntarily embodied in a single document, no other utterance of intent or will on the same subject can be given jural effect. Hence, such a declaration is excluded from consideration even in the process of interpretation, not because it would not for that purpose be useful, but because it would be improper for the other purpose. There being two conceivable purposes for which it could be used, the one proper, the latter improper, it is excluded because of the risk that the latter would dominate and that the temptation to abuse would be too strong." IX *Wigmore on Evidence* (Third Ed.) at 230.

has not been sustained." (116 Me. at 396, 102 A. at 113)

See also *Bar Harbor Banking and Trust Company, Trustee v. Preachers' Aid Society of the Methodist Church et al.,* Me., 244 A.2d 558, 561, 562 (1968); *Fiduciary Trust Co., Trustee v. Silsbee et al.,* 159 Me. 6, 13, 14, 187 A.2d 396 (1963). Cf. *Fiduciary Trust Co. v. Brown et al.,* 152 Me. 360, 371–377, 131 A.2d 191 (1957).

██ We decide, therefore, that the presiding Justice here acted without error in admitting in evidence testimony as to various circumstances extraneous to the will to assist in the determination of whether it was the intendment of the testators to include as a beneficiary of their bounty the plaintiff Jennifer Sherwood Ziehl.[7]

██ In light of the evidence which was thus correctly admitted—showing that the testators executed their wills knowing that their daughter Sylvia was physiologically incapable of having natural born children and that the testatrix Carrie S. Rhodes had urged her daughter Sylvia to adopt children [8]—the presiding Justice was justified in concluding that the

".  .  . references to 'children' of Sylvia Rhodes Ziehl in the wills of her parents Richard Rhodes and Carrie S. Rho-

7. This holding is consistent with the rule generally recognized in the other jurisdictions which, like Maine, attribute a "presumptive" meaning to exclude "children by adoption" when the word "children" is used by a stranger to the adoption to designate beneficiaries of his bounty. See: Oler, Construction of Private Instruments where Adopted Children are Concerned: II, 43 Mich.L.Rev. 901, 906–917, 932–938 (1945), and appropriate cases collected in Annot. 86 A.L.R.2d 12.

8. Defendants also contended that the admission in evidence of the testimony which showed these circumstances, because that testimony consisted of plaintiff's narration of conversation between her and the testators, violated the rule excluding hearsay evidence, as well as the "dead man" statute (16 M.R.S.A. § 1). (The Superior Court made its decision before the Maine Rules of Evidence had become effective. With the promulgation of the Maine Rules of Evidence, by reason of Rule 601 M.R. Evid. and 4 M.R.S.A. § 9–A, the "dead man" statute was repealed).

des include adopted children of said Sylvia Rhodes Ziehl."

The entry is:

Appeals denied; judgment of the Superior Court affirmed.

POMEROY, J., did not sit.

DUFRESNE, A. R. J., sat at oral argument as Chief Justice, but retired prior to the preparation of the opinion. He has joined the opinion as Active Retired Justice.

As to the hearsay claim, plaintiff's testimony of her conversation with her parents was offered not as proof of the truth of any matters asserted in the conversation but rather only to show that the testators knew that their daughter had undergone an hysterectomy.

As to the "dead man" statute, we find that the instant situation falls within one of the exceptions to its applicability. The posture of the will construction issues is such, here, that the plaintiff is not an *adversary* of the *estates* of the decedents. The dispute is among those who claim entitlement to share as beneficiaries of the estate. Cf. *In re the Estate of Morine,* Me., 363 A.2d 700 (1976). Hence, although Maine National Bank is a party to this action as Trustee of the testamentary trusts established by Carrie and Richard Rhodes and might be deemed a "legal representative" of the testators, that representation is here only "nominal", and Section 1(3) of 16 M.R.S.A. excepts it from the evidence-exclusion rule prescribed by the "dead man" statute.